IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **LANGSTON & LANGSTON, PLLC;**<br>**JEFF CAHN; LAURIE CAHN; AND**<br>**DAVID CAHN** | **PLAINTIFFS** |
| **V.** | **CAUSE NO. 3:18-CV-741-CWR-FKB** |
| **SUNTRUST BANK; CHARLES**<br>**HOPKINS, III,** *individually and d/b/a* **CML**<br>**Home Improvements; DAZAI HARRIS;**<br>**AND JOHN DOES 3-10** | **DEFENDANTS** |

*and*

| | |
|---|---|
| **SUNTRUST BANK** | **CROSS CLAIMANT** |
| **V.** | |
| **CHARLES HOPKINS, III,** *individually and*<br>*d/b/a* **CML Home Improvements; DAZAI**<br>**HARRIS** | **CROSS DEFENDANTS** |

## <u>ORDER</u>

Before the Court is Defendant SunTrust Bank's motion for summary judgment. The

matter is fully briefed and ready for adjudication.

## I.      Factual and Procedural History

This lawsuit stems from a wire transfer scam. Plaintiff Langston & Langston, PLLC

("L&L"), a Mississippi law firm, represented Plaintiffs Jeff Cahn, Laurie Cahn, and David Cahn

in a wrongful death suit against a drug rehabilitation facility. The facility reached a settlement with

the Cahn family in April 2018, and the settlement was a "lump sum" for the family. L&L and the

Cahn family intended the settlement proceeds of $229,559.20 to be distributed equally among the

three family members – with each member receiving $73,519.73.

During settlement negotiations, however, an unknown individual hacked the email account of Jeff Cahn. Jeff served as the spokesperson for the Cahn family throughout the litigation and settlement proceedings.

On April 24, 2018, L&L received a Release executed by each member of the Cahn family. On May 4, the hacker emailed L&L with fraudulent wiring instructions regarding distribution of the Cahn family settlement proceeds. On May 9, L&L authorized its bank, BankPlus, in Jackson, Mississippi to wire transfer funds to Jeff Cahn, Laurie Cahn, and David Cahn. The instructions directed three separate deposits of $73,519.73 to three different bank accounts – two SunTrust accounts and one Wells Fargo account. The accounts were purportedly held by Jeff Cahn, Laurie Cahn, and David Cahn individually.

On the morning of May 9, BankPlus transmitted to SunTrust a request to transfer funds from the L&L client account at BankPlus to the account purportedly belonging to David Cahn at SunTrust. SunTrust accepted the wire transfer order at 12:01 PM,[1] and at 12:02 PM, the funds were credited to the account. However, the account did not belong to David Cahn. Though the account number provided by BankPlus was a legitimate account at SunTrust, it was not associated with David Cahn's name and address as provided by BankPlus. The account actually belonged to Defendant Charles Hopkins.

Prior to Hopkins withdrawing any of this money from the account, Jeff Cahn discovered the fraud and notified L&L. L&L immediately informed BankPlus, and by 2:42 PM that same day, BankPlus notified SunTrust and instructed it to: "PLS [please] RET [return] FUNDS, SUSPECT FRAUD." Docket No. 88-17 at 3.

---

[1] The parties are inconsistent when referencing times in their memoranda; they switch between Eastern and Central time. For clarity, the Court will refer to the times as provided in the automated bank records.

Twenty-six minutes later, Hopkins entered a Hendersonville, Tennessee branch of SunTrust. Via cash and cashier's check, he withdrew a total of $59,865 from the funds intended for David Cahn. The cashier's checks were made payable to Dazia Harris and an entity created by Harris.

The following day, the FBI contacted the Vice President of Fraud Operations at SunTrust, Debbie Ligouri. The FBI advised Ligouri that it had received notification of fraudulent activity related to the SunTrust account in question. The FBI also inquired into the status of the funds and requested that the funds be frozen.  Ligouri followed company protocol and checked the status of the funds via one of SunTrust's system of record for customer accounts. The record indicated that the funds were still in the account. Based on this information, Ligouri – who was unaware of the withdrawals made by Hopkins the previous day – advised the FBI that there had been no transactions. SunTrust subsequently returned the remaining funds intended for David Cahn to L&L.

In this suit, Plaintiffs seek to shift David Cahn's $59,865 loss to SunTrust. They lay out their negligence claims against SunTrust in different ways, but all are rooted in three central allegations: (1) SunTrust negligently failed to reject the wire transfer from BankPlus because the name and address provided by BankPlus did not match the name and address associated with the SunTrust account number, (2) after being put on notice of the suspected fraudulent wire transfers, SunTrust negligently failed to immediately freeze or return the funds, and (3) SunTrust negligently misrepresented, concealed, or provided false or incomplete information regarding the status of the funds to the FBI.

Lastly, Plaintiffs claim that SunTrust's failure to prevent the fraudulent wire transfer is a violation of the Electronic Fund Transfer Act.

II.     **Legal Standard**

Summary judgment is appropriate when the movant can show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (quotation marks and citations omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

III.    **Discussion**

Because this case is proceeding in diversity, the applicable substantive law is that of the forum state, Mississippi. *Erie R.R. Co. v Tompkins*, 304 U.S. 64 (1938). Mississippi law is determined by looking to the decisions of the Mississippi Supreme Court. *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). When Mississippi case law on a topic is limited, "we look to caselaw around the country for guidance." *Newsome v. Peoples Bancshares*, 269 So. 3d 19, 34 (Miss. 2018). To avoid confusion when citing case law from other states or circuits, this Court will refer to Article 4A of the UCC by chapter and part, *i.e.*, UCC § 4A-101, *et seq.*

4

A.        **Uniform Commercial Code**

Mississippi codified Article 4A of the Uniform Commercial Code ("UCC") at Mississippi

Code §§ 75-4A-101, *et seq*. Article 4A of the UCC governs electronic "funds transfers." UCC

§ 4A-102; *see also* Comment to UCC § 4A-102 ("Article 4A governs a specialized method of

payment . . . commonly referred to in the commercial community as a wholesale wire transfer.").

In drafting the UCC rules, a deliberate decision was made "to use precise and detailed rules

to assign responsibility, define behavioral norms, allocate risks and establish limits on liability,

rather than to rely on broadly stated, flexible principles." Comment to UCC § 4A-102. The

Comment to UCC § 4A-102 further explains that these rules:

> are intended to be the *exclusive* means of determining the rights, duties and
> liabilities of the affected parties in any situation covered by particular provisions of
> the Article. Consequently, resort to principles of law or equity outside of Article 4A
> is not appropriate to create rights, duties and liabilities inconsistent with those stated
> in this Article.

*Id.* (emphasis added). In other words, common-law claims are displaced by the UCC when it

directly addresses or specifically covers the allegations. *Newsome*, 269 So. 3d at 34 (citations

omitted).

A few definitions from Article 4A of the UCC are pertinent to this case. "Article 4A governs

a method of payment in which the person making payment (the 'originator') directly transmits an

instruction to a bank either to make payment to the person receiving payment (the 'beneficiary')

or to instruct some other bank to make payment to the beneficiary." Comment 1 to UCC § 4A-104.

A payment order is "an instruction of a sender to a receiving bank." UCC § 4A-103(a)(1). A funds

transfer is a "series of transactions, beginning with the originator's payment order, made for the

purpose of making payment to the beneficiary of the order." *Id.* § 4A-104(a). The bank that receives

payment order instructions from the originator is the "originator's bank." *Id.* § 4A-104(d). A

beneficiary's bank is the "bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order . . . ." *Id.* § 4A-103(a)(3). And finally, the beneficiary is the "person to be paid by the beneficiary's bank." *Id.* § 4A-103(a)(2).

### 1.      Section 4A-207

UCC § 4A-207 governs liability when a wire transfer "misdescribes" a beneficiary. "A misdescription occurs when a wire identifies a beneficiary by name and account number and the name and account number identify different persons or entities." *First Sec. Bank of New Mexico, N.A. v. Pan American Bank*, 215 F.3d 1147, 1152 (10th Cir. 2000).

A misdescription happened in this case. L&L asked BankPlus to wire transfer funds to Jeff Cahn, Laurie Cahn, and David Cahn. The bank account number provided with David Cahn's name, however, was actually registered to a different person – Charles Hopkins. Thus, all negligence allegations relating to this misdescription are displaced by UCC § 4A-207.

Section 4A-207 lays out exactly who is liable under several possible situations involving a misdescription. When a beneficiary's bank receives a payment order identifying a name and number, but the beneficiary's bank "does not know that the name and number refer to different persons, it may rely on the number as the proper identification of the beneficiary of the order." UCC § 4A-207(b)(1). The beneficiary's bank does not have a duty to "determine whether the name and number refer to the same person." *Id.*

If, on the other hand, the beneficiary's bank knows of the conflict between the name and number and nevertheless makes payment to a person not entitled to receive it, then "no person has rights as beneficiary." *Id.* § 4A-207(b)(2). "If no person has rights as beneficiary, acceptance of the order cannot occur." *Id.* And when acceptance of the order does not occur, the originator's bank is not obligated to pay beneficiary's bank. Comment 2 to UCC § 4A-207. Furthermore, the

6

originator is excused from its obligation to pay the originator's bank. *Id.* Thus, when the

beneficiary's bank knows that there is a conflict between the name and number provided but

proceeds with payment to the incorrect person, the beneficiary's bank takes the loss. *Id.*

Knowledge is the key issue in this inquiry. "Know" and "knowledge" in Article 4A mean

actual knowledge. *Id.* "The time of payment is the pertinent time at which knowledge or lack of

knowledge must be determined." *Id.* The UCC defines when "payment" occurs in different

circumstances. "If the beneficiary's bank credits an account of the beneficiary of a payment order,"

then there are three scenarios under which a wire transfer is considered "payment": (1) "the

beneficiary is notified of the right to withdraw the credit," (2) "the bank lawfully applies the credit

to a debt of the beneficiary," or (3) "funds with respect to the order are otherwise made available

to the beneficiary by the bank." *Id.* § 4A-405(a).

Because there is no Mississippi or Fifth Circuit case law addressing the meaning of the

phrase "otherwise made available to the beneficiary by the bank," the Court finds guidance from

the Tenth Circuit which provides an in-depth analysis of UCC § 4A-405(a)(iii). That court held

that payment as defined by § 4A-405(a)(iii) can occur "when a beneficiary's account is credited

and the funds immediately are made available to the beneficiary."[2] *Pan American Bank*, 215 F.3d

at 1159.

---

[2] As support for its reasoning, the Tenth Circuit explained:

> We cannot ascertain from the plain statutory language why funds are not
> "otherwise made available" to a beneficiary and why payment does not occur
> when a beneficiary's bank credits a beneficiary's account and immediately makes
> the funds available to the beneficiary. *See* Tony M. Davis, *Comparing Article 4A
> With Existing Case Law on Funds Transfers: A Series of Case Studies,* 42 Ala.
> L.Rev. 823, 873 (1991) (concluding that when wired funds were placed in
> beneficiary's account and immediately made available to beneficiary, bank "paid"
> beneficiary under 4A–405(a)). The drafters of Article 4A intended that payment
> coincide with the beneficiary's receipt of a benefit from the payment
> order. *See* N.M. Stat. Ann. § 55–4A–405, Official Comment 1. Allowing the
> beneficiary the right to withdraw certainly qualifies as a benefit to the beneficiary,
> even if the right is not immediately exercised. As White & Summers stated in

Under the Tenth Circuit's interpretation, "payment" of the wire transfer intended for David Cahn occurred at 12:02 PM. SunTrust's automated records (the "History Detail" for wire transfers) indicate that SunTrust had notice of the wire intended for David Cahn at 12:01 PM. *See* Docket No. 88-17 at 1. Subsequently, at 12:02 PM,[3] the funds were credited and made available to the actual account owner – Charles Hopkins. *Id.* at 2. Because the funds were made immediately available at 12:02 PM, "payment" as defined by § 4A-405(a)(iii) occurred at 12:02 PM.

The next inquiry is whether at 12:02 PM, SunTrust had actual knowledge of the discrepancy between the name and account number provided. To have "actual knowledge of a piece of information, one must be aware of it." *Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 776 (2020) (quotation marks omitted). As discussed earlier, under UCC § 4A-207(b)(1), a beneficiary's bank does not have a duty to verify that the originator's bank provided the correct name and corresponding matching account number.

SunTrust has a fully automated system, and the time between receipt of the payment order from BankPlus and actual payment to Hopkins's account was only one minute. Data stored in a computer system does not constitute actual knowledge, even if inspection of the data would have revealed a misdescription. *Wetherill v. Bank IV, Kansas, N.A.*, 145 F.3d 1187, 1192 (10th Cir. 1998). Plaintiffs have failed to provide evidence that within the one minute between the 12:01 PM acceptance and 12:02 PM payment, SunTrust acquired actual knowledge of the misdescription. Based on the records, the earliest that actual knowledge of the conflict could be imputed to

their discussion of acceptance and payment under Article 4A, "[f]unds are typically 'made available' to a beneficiary by allowing the beneficiary the right to withdraw." White & Summers, *supra,* § 23–4, at 32

*Pan American Bank*, 215 F.3d at 1158-59.

[3] "The funds would have been in the client's account based on the DDA_BACKEND at the bottom [of the History Detail], which was 12:02:01. It went through pay advise to the DDA_BACKEND and GL_BACKEND." Docket 88-3 at 11.

SunTrust is at 2:42 PM, when BankPlus transmitted a notice to SunTrust of suspected fraud. This is more than two hours after the funds were made available to Hopkins – meaning more than two hours had elapsed since payment.

Because it did not have actual knowledge of the misdescription at the time of payment, SunTrust is not liable to the Plaintiffs under UCC § 4A-207.

### 2.       Section 4A-211

UCC § 4A-211 governs the cancellation of payment orders or wire transfers. This section addresses "conditions under which cancellation or amendment" to payment orders is "both effective and rightful." Comment 1 to UCC § 4A-211. "If the conditions stated in this section are not met the attempted cancellation or amendment is not effective." *Id.*

BankPlus sent SunTrust a request for return of funds because of suspected fraud. Under § 4A-211, this was an attempted cancellation or amendment to the original payment order. Therefore, negligence claims regarding any duty SunTrust may have had with respect to (1) rejecting a misdescribed wire transfer, (2) immediately freezing funds, or (3) returning funds as a result of the cancellation request are displaced by UCC § 4A-211.

A request for cancellation or amendment to a payment order "is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication *before* the bank accepts the payment order." UCC § 4A-211(b) (emphasis added). *After* acceptance of a payment order, "cancellation or amendment of the order is not effective unless the receiving bank *agrees* or a funds-transfer system rule allows cancellation or amendment without agreement of the bank." *Id.* at (c) (emphasis added). "[A] receiving bank may agree to cancellation or amendment of the payment order under subsection (c) but is not required to do so regardless of the circumstances."

Comment 5 to UCC § 4A-211. Lastly, a beneficiary's bank accepts a payment order at the earliest of several circumstances. The relevant point here is "when the bank [] pays the beneficiary as stated in Section 4A-405(a)." UCC § 4A-209(b)(1).

As discussed above, payment as defined by UCC § 4A-405(a) occurred at 12:02 PM. Thus, under § 4A-209(b)(1), 12:02 PM is also when SunTrust accepted the payment order from BankPlus. BankPlus sent the refund request at 2:42 PM, well after the payment order had already been accepted by SunTrust. The parties have not provided evidence of a pre-existing "funds-transfer" rule agreement between SunTrust and BankPlus. Thus, BankPlus's cancellation request would be operative only if the receiving bank, SunTrust, agreed to the cancellation. SunTrust is not required to agree to cancellation, and because it did not agree, the cancellation request from BankPlus was not effective.

For these reasons, SunTrust did not violate § 4A-211 by failing to immediately return or freeze all funds after receiving the request from BankPlus, as SunTrust had already accepted and paid the wire transfer.

## B.      Negligent Misrepresentation and Fraudulent Misrepresentation

Although other courts have found negligence claims relating to the misrepresentation of funds to be displaced by Article 4A of the UCC, there is not a designated section in Article 4A dedicated to misrepresentation. So, out of an abundance of caution, this Court will turn to Mississippi case law for its analysis.

To succeed on a claim for negligent misrepresentation, Plaintiffs must prove that:

(1) a misrepresentation or omission of a *fact*; (2) that the representation or omission is material or significant; (3) that the person charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons; (4) that they reasonably relied upon the bank officer's misrepresentation or omission; (5) that they suffered damages as a direct and proximate result of such reasonable reliance.

*Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992) (citations omitted) (emphasis in original).

Plaintiffs assert that Ligouri, the Vice President of Fraud and Operations at SunTrust, negligently misrepresented the status of the funds to the FBI. Ligouri explained in her deposition that in response to the FBI's inquiry, she checked SunTrust's Channel-Link system. Docket No. 107-1 at 4. The system reflected that the funds were still available in the account and that the account had been frozen, so Ligouri relayed this information to the FBI. The steps Ligouri took to answer the FBI's inquiry were standard company procedure. *Id.* at 5.

Plaintiffs emphasize that Ligouri *could* have checked other SunTrust systems to determine the correct status of the funds. But just because it was possible for Ligouri to check multiple SunTrust systems to verify the status of funds does not mean she was negligent for checking only the Channel-Link system. Ligouri followed company protocol, and Plaintiffs have not provided any evidence that she did not exercise reasonable care when conveying information to the FBI. Accordingly, Plaintiffs cannot succeed on their negligent misrepresentation claim.[4]

Perhaps obviously, because Plaintiffs must meet an even higher standard to prove fraudulent misrepresentation, their claim of fraudulent misrepresentation cannot proceed either.

## C.   Electronic Funds Transfer Act

Under the Electronic Funds Transfer Act ("EFTA"), an electronic fund transfer means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument,

---

[4] Even if Plaintiffs could prove that Ligouri did not act with reasonable care, it is unclear from this record that Ligouri's actions were the proximate cause of the damages Plaintiffs sustained. Plaintiffs' averments hypothesizing about what others "more likely than not" would have done are conclusional allegations and mere speculation. Those statements are not competent summary judgment evidence on which this Court can rely. *See Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").

which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). An electronic fund transfer does not include any "transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses." 12 C.F.R. § 205.3(c)(3).

In this case, the wire transfer at issue was conducted via FedLine, a system which interfaces with FedWire. *See* Docket No. 88-15. Because the wire transfer was completed through a system that interfaces with FedWire, the EFTA does not apply.

## IV.    Conclusion

SunTrust's motion for summary judgment is granted. SunTrust's remaining motions are now moot. The remaining parties shall contact the Magistrate Judge's chambers within 10 days to schedule a trial setting.

**SO ORDERED**, this the 20th day of August, 2020.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE